# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| WILLIE HUDDLESTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case number 4:04cv1053 DJS |
| | ) TCM |
| JO ANNE B. BARNHART, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying Willie

Huddleston disability insurance benefits ("DIB") under Title II of the Social Security Act

("the Act"), 42 U.S.C. §§ 401-433, and supplemental security income benefits ("SSI") under

Title XVI of the Act, 42 U.S.C. §§ 1381-1383b.  Plaintiff has filed a brief in support of his

complaint; the Commissioner has filed a brief in support of her answer.  The case was

referred to the undersigned United States Magistrate Judge for a review and recommended

disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

Willie Huddleston ("Plaintiff") applied for DIB and SSI in November 2001, alleging

he was disabled as a result of high blood pressure, diabetes, and problems with his left knee

and ankle, back, and eyes. (R. at 31-32, 63-65.)[1] In one application he alleged he had been disabled since January 1, 1994; in the other he alleged a disability onset date of November 16, 2001. (Id.) These applications were denied initially and after a hearing before Administrative Law Judge ("ALJ") Myron D. Mills. (Id. at 11-18; 25-30; 35; 47-51.) The Appeals Council then denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 3-5.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing. Estella Henry was present but did not testify.

Plaintiff testified that he was, at the time of the 2004 hearing, 56 years old,[2] was 6 feet 3 ½ inches tall, and weighed 285 pounds. (Id. at 242.) He was left-handed. (Id.) He quit school after the ninth grade. (Id.) He currently lived with Ms. Henry. (Id.)

Plaintiff last worked as a machine operator. (Id. at 242.) That job ended in 2001. (Id. at 243.) He had to quit after his left knee became caught in a machine and required surgery. (Id.) His knee hurt before the operation, and it still hurts. (Id. at 244.) He went to physical therapy for awhile; that also did not help. (Id.) Now he takes pain pills. (Id. at 249.) Plaintiff occasionally uses a cane. (Id.)

---

[1]References to "R." are to the administrative record filed by the Commissioner with her answer.

[2]Plaintiff was born on March 19, 1947.

- 2 -

Plaintiff further testified that he is diabetic.  (<u>Id.</u> at 244.)  He checks his blood sugar twice daily – it usually is between 150 to 220 – and takes pills.  (<u>Id.</u>)  He also has a bad back, and has had since falling out of a tree when he was a child.  (<u>Id.</u> at 245.)  He has never had surgery on his back.  (<u>Id.</u>)  If he bends over, he has pain in his lower back.  (<u>Id.</u> at 248.)  His knees and ankles hurt if he stoops or crouches.  (<u>Id.</u>)  He can squat but has to use a wall or other similar structure to stand up from a squat.  (<u>Id.</u> at 248.)  Additionally, his left arm hurts.  (<u>Id.</u> at 247.)  Sometimes he cannot raise it higher than his shoulder.  (<u>Id.</u>)  He broke his right shoulder blade in 1999.  (<u>Id.</u> at 248.)

Plaintiff has not looked for a job in the past six months.  (<u>Id.</u> at 245.)  He cannot sit for long without his legs going to sleep and his back hurting.  (<u>Id.</u>)  Nor does he have the necessary skills for an office job.  (<u>Id.</u>)  He cannot sit for longer than 90 minutes without having to stand and cannot stand for longer than 60 minutes without having to sit down.  (<u>Id.</u> at 247.)  He cannot lift anything heavier than a 10-pound sack of potatoes.  (<u>Id.</u>)

Plaintiff drives a car for routine errands, e.g., going to the doctor or grocery store.  (<u>Id.</u> at 245.)  When he goes shopping – approximately once a month – his friend Estella lifts the bags.  (<u>Id.</u> at 246.)  His daily activities are primarily watching television with his feet elevated.  (<u>Id.</u>)  He does not play any sports, or do any yard work.  (<u>Id.</u>)  He does go to church on Sundays.  (<u>Id.</u>)

## Medical and Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to that application, records from various health care providers, and reports of two evaluations.

When applying for DIB and SSI, Plaintiff completed a Disability Report, listing high blood pressure, diabetes, and problems with his lower back, left knee and ankle, and eyes as his impairments. (Id. at 108.) These conditions first bothered him in May 2001 and prevented him from working as of November 16, 2001. (Id.) Plaintiff had had two jobs since July 1984. (Id. at 109.) The first job was as a fork lift operator and ended in December 1999. (Id.) The second job was as a machine operator and lasted from March 2000 to November 2001. (Id.) The first job required that he occasionally lift up to 100 pounds and frequently lift 20 pounds.[3] (Id.) He had been treated for his left ankle by a Dr. Myer and for his diabetes by Dr. Bonnie. (Id. at 110.) He had also attended the Labor Health Institute for his left ankle. (Id. at 111.) Plaintiff took several medications; one for his high blood pressure, prescribed by Dr. Puritt, one for his diabetes, prescribed by Dr. Heartwingle, and a water pill. (Id. at 113.) He had no side effects from any of these medications. (Id.)

The next month, Plaintiff completed a Pain Questionnaire, listing two additional medications, Ibuprofen and Celebrex, prescribed by Dr. Myer. (Id. at 90.) He reported that the pain in his left knee and right ankle was constant and had been limiting his activities for two years. (Id.) In a Claimant Questionnaire, Plaintiff further reported that he lived alone;

---

[3]The information about his past jobs was repeated in a Work History Report. (Id. at 95-97.)

his pain prevented him from socializing with his family; he very seldom did any shopping; he paid his niece to do his chores; and he left his house everyday and drove his car to the store or to visit his mother.  (Id. at 92-93.)

The medical records before the ALJ begin in February 1999 when Plaintiff was diagnosed by physicians at St. Louis University with diabetes mellitus.  (Id. at 142-43.)  He was started on Amaryl, and reported two weeks later that he was doing well.  (Id. at 142.)  At that visit, his diabetes was described as "well controlled," as was his hypertension.  (Id.)  On March 15, Plaintiff received some diabetes control counseling.  (Id. at 140.)  He was having some vision problems.  (Id.)  He was then walking one mile at lunch every day.  (Id.)  He was encouraged to continue doing so and to try to increase the walking to thirty minutes.  (Id.)  He was agreeable to trying.  (Id. at 141.)

Plaintiff had no new complaints at his follow-up visit on April 12.  (Id. at 139.)  He was exercising daily, either walking or bicycling.  (Id. at 137.)  He occasionally ate some food high in fat, but had decreased his weight slightly by diet and exercise.  (Id.)  His weight was then 277 pounds.  (Id. at 136.)  He was encouraged to measure his portions, avoid sweets, and lose weight at the rate of ½ to two pounds a week.  (Id. at 136-37.)

Plaintiff was next seen in the endocrinology clinic on August 25.  (Id. at 132.)  He had gained two pounds and his non-fasting blood glucose was 236.  (Id.)  He was continuing to walk one mile a day.  (Id.)  He did not have any nocturia, or need to urinate at night.  (Id.)  On November 22, his weight had decreased to 258 pounds.  (Id. at 130.)  He had no current

complaints, and no problems with blurred vision or numbness.  (Id.)  He was having to urinate only once a night.  (Id.)

At his March 17, 2000, visit for a refill of his medications, Petitioner reported that he was feeling well.  (Id. at 128.)  His blood sugar was running in the 100's, but he had no other complaints.  (Id.)  He was to follow up in endocrinology.  (Id.)  Plaintiff did not keep his next, May 12, appointment.  (Id. at 127.)

At his next follow-up appointment, on January 29, 2001, Plaintiff again had no complaints.  (Id. at 126.)  He had no chest pain, no shortness of breath, no headaches, and no blurred vision.  (Id.)  Three months later, on April 24, Plaintiff complained of lower back pain.  (Id. at 124.)  He had had pain for one week after having slept on the couch.  (Id.)  The pain would begin in the left side of his lower back and radiate down his right leg.  (Id. at 123.)  At the time of the examination, the pain, an aching pain, was a five out of ten and was better that day than the day before.  (Id.)  The pain was also better when Plaintiff lay on his left side, was worse when he sat, and was relieved by standing.  (Id.)  The pain was aggravated by his work as a machine operator.  (Id.)

On August 16, Plaintiff consulted the University physicians about his right ankle.  (Id. at 121.)  He reported that he had had a "partial[ly] swollen" ankle for six months.  (Id.)  The swelling was accompanied by pain, which had started as a dull pain and had gradually become worse with walking.  (Id.)  He had tried Tylenol and an ankle brace, neither had helped.  (Id.)  An x-ray revealed degenerative changes in his right ankle.  (Id. at 213.)  He was to referred to an orthopedic doctor.  (Id. at 121.)

Plaintiff followed up with the University physicians on September 24. (<u>Id.</u> at 118.) It was noted that he had had no significant improvement on the earlier-prescribed Celebrex. (<u>Id.</u>) The ankle and foot pain was worse when he moved, but was relieved by rest. (<u>Id.</u>) It was noted on examination that his hypertension was well controlled. (<u>Id.</u>)

On October 30, Plaintiff consulted the physicians at the Labor Health Institute about his right ankle. (<u>Id.</u> at 148.) The pain had been present for six months and it hurt him to walk. (<u>Id.</u>) He had injured the ankle in 1972, and had worn a cast on the ankle within the last five years after injuring it in a fall. (<u>Id.</u>) An x-ray revealed significant osteoarthritis, possibly related to an old injury. (<u>Id.</u> at 148-49.) Physical therapy and Celebrex were prescribed. (<u>Id.</u> at 148.) He was to see an orthopedist, and was given a restriction so he would not have to work overtime. (<u>Id.</u>) He did not keep his next appointment. (<u>Id.</u> at 147.) Four days later, November 20, he was appeared for a refill on his medications. (<u>Id.</u>) The physician recommended an appointment with a surgeon for possible surgical reconstruction and bone graft. (<u>Id.</u>) He also recommended appropriate shoes with good arch support. (<u>Id.</u>)

Plaintiff did consult a surgeon and on January 31, 2002, Plaintiff underwent arthoscopic surgery to his right foot and ankle. (<u>Id.</u> at 168-80, 207-09.) On discharge, he was to rest that day and increase his activity the next day as tolerated. (<u>Id.</u> at 177.) He was to use crutches and return for a follow-up visit in one week. (<u>Id.</u>) Four days later, he returned for a recheck of his right ankle. (<u>Id.</u> at 206.) His right foot was placed in a boot, and he was to start a range of motion without any weight bearing. (<u>Id.</u>) He returned the next week for the removal of his sutures. (<u>Id.</u>) No redness, draining, or swelling was noted. (<u>Id.</u>)

At his appointment four weeks later, the surgeon, Richard B. Helfrey, D.O., again concluded that Plaintiff should start on range of motion. (Id. at 204.) He should not bear any weight on his right ankle until the next appointment, in two weeks, but otherwise was considered to be doing "quite well." (Id.) On March 6, Plaintiff was to start weight-bearing the next week when in the boot. (Id.) He was also to start physical therapy. (Id.) Dr. Helfrey opined that Plaintiff would be released to return to work in four weeks. (Id.) On April 3, it was noted that Plaintiff had tolerated his physical therapy well and was to continue on his home exercises. (Id. at 203.) He could try weight-bearing without the boot or a crutch as tolerated. (Id.) There is no mention of a return to work in the notes of this last reported visit.

While being treated for his right ankle problems, Plaintiff injured his left knee when at work on November 9, 2001. (Id. at 152, 196.) A subsequent MRI revealed the tear of the posterior horn of the medial meniscus. (Id. at 144-45, 152.) On December 6, he consulted David Andersen, M.D., after having repetitive popping in the knee and occasional buckling. (Id. at 196.) On examination, he had some tenderness along the medial joint line and some discomfort, but also had a good active range of motion in his left knee and good motor strength in the muscle groups about his knees and ankles. (Id. at 197.) Plaintiff's past medical history included diabetes and hypertension but no other serious illnesses, operations, or injuries. (Id. at 152.) His deep tendon reflexes in his knees were symmetric. (Id.) On December 14, he underwent arthroscopic surgery to repair a torn medial meniscus in his left knee. (Id. at 152-55.) Plaintiff tolerated the surgery well and was discharged with instructions to limit his activities for 24 hours, not to engage in any heavy lifting or work

until released by his physician, and to otherwise resume his normal activities.  (Id. at 155, 158.)  Six days after the surgery, Plaintiff reported that he was "doing quite well."  (Id. at 195.)  He was still using a crutch for support, but had a good active motion.  (Id.)  The physician recommended a referral to physical therapy to improve the strength and his range of motion in his knee.  (Id.)  If light duty could be provided with a restriction to desk work, Plaintiff would return to work on December 21.  (Id.)  On January 3, 2002, Plaintiff's knee continued to improve.  (Id. at 194.)  He still had some discomfort, particularly with prolonged walking or climbing stairs.  (Id.)  He did not have any buckling.  (Id.)  Plaintiff was encouraged to continue on a home exercise program and could attempt a return to work on January 9.  (Id.)  On January 17, Plaintiff returned earlier than his next-scheduled appointment.  (Id. at 193.)  He had been having some difficulty with pain and swelling his knee.  (Id.)  He also had had one episode of his knee buckling.  (Id.)  On examination, he walked with a mildly antalgic gait[4] and showed a moderate knee joint effusion.[5]  (Id.)  He had a good active motion in his knee.  (Id.)  He was to take an anti-inflammatory, stay off work for the remainder of the week,[6] and to return to work the next Monday.  (Id.)  He was to see Dr. Anderson again on February 14.  (Id.)  Also on February 14, he was to see a

_____

[4]An antalgic gait is "[a] manner of walking or gait which aims to shorten as much as possible the length of time that a painful limb must support the weight of the body."  Attorneys' Dictionary of Medicine, A-400-01 (1999).

[5]An effusion is the escape of fluid from the blood vessels or lymphatics into the tissues or a cavity; a joint effusion is the escape of this fluid into a joint cavity.  Stedman's Med. Dictionary, 547 (26th ed. 1995).

[6]January 17, 2002, fell on a Thursday.

physical therapist.  (Id. at 192.)  On January 30, Plaintiff saw his referring physician, Dr. A. B. Patel, and reported that his left knee was painful and swollen, although he was better since his last visit.  (Id. at 186, 225.)  He was not working.  (Id. at 186.)  He had been to physical therapy only once and had last done home exercises two weeks before.  (Id.)  He was scheduled to have surgery on his right foot to remove a bone spur.  (Id.)  On February 14, Plaintiff kept his scheduled appointment with Dr. Andersen.  (Id. at 182.)  He reported that he had an occasional "little aching discomfort" in his left knee but was otherwise doing "fairly well."  (Id.)  He had a good active range of motion in his knee and normal knee joint stability.  (Id.)  He was encouraged to use an anti-inflammatory for any intermittent discomfort.  (Id.)  Dr. Andersen opined that Plaintiff had "reached a state of maximum medical improvement regarding his left knee injury[,]" and could return, once his right ankle problem was resolved, to unrestricted activities.  (Id.)

The next medical record is of Plaintiff's visit to the emergency room at Lincoln County Medical Center on September 10, 2003.  (Id. at 217.)  Plaintiff had felt lightheaded the night before.  (Id.)  He felt better when he lay down; however, that morning he again felt lightheaded.  (Id.)  Plaintiff was discharged with instructions to follow up with his primary care physician.  (Id.)  He followed up with James Bockhorst, M.D., the next day.  (Id. at 215.)  Dr. Bockhorst had not treated Plaintiff before.  (Id.)  Dr. Bockhorst noted that Plaintiff reported having been told the day before in the emergency room that he had previously had a heart attack.  (Id.)  This conclusion was based on Plaintiff's EKG.[7]  (Id.)  Because of his

---

[7] The EKG is not included in the medical records.

high blood pressure, diabetes, high cholesterol, right ankle problem, and left knee problem, Plaintiff felt unable to work.  (Id.)

In addition to the records of Plaintiff's medical treatment, the ALJ had before him the results of a physical exam of Plaintiff performed by a consulting physician, Zahirul Haque, M.D., in January 2002.  (Id. at 159-65.)  The exam lasted 40 minutes.  (Id. at 159.)  The history of his complaints included (1) diabetes mellitus for the past 15 years, accompanied by nocturia and blurred vision; (2) hypertension for the past 18 years, accompanied by blurred vision; (3) joint pains for the past 30 years, accompanied by swelling, pain, and stiffness; (4) back pain for the past 20 years, accompanied by sharp pains, without any radiation; and (5) blurred vision for the past 2 years.  (Id. at 159-60.)  His medical problems limited his walking to 5 to 10 minutes or 1 block, his standing to 10 minutes, his sitting to 30 minutes, and his lifting to 25 pounds.  (Id. at 160.)  He was left-handed, and had no difficulty holding a coffee cup, writing, opening a jar top, buttoning, or combing his hair.  (Id.)  His weight was 283 pounds.  (Id.)  His corrected vision was 20/40 in both eyes.  (Id.)  He had a cataract on his right eye.  (Id. at 161.)  On examination, he had difficulty bending, squatting, and walking toe and heel secondary to the pain in his left knee and right ankle.  (Id. at 161.)  He could get on and off the examining table without difficulty.  (Id.)  There was no discernible muscle atrophy or wasting.  (Id.)  He was slightly limited in his ability to flex and extend at his left knee, i.e., he could do so to only 120° out of 150°, and in his ability to forward flex his lumbar spine, i.e., he could do so to only 70° out of 90°.  (Id. at 163-64.)

Otherwise, he had a normal range of motion in his shoulders, elbows, wrist, hips, and cervical spine.  (Id.)

Two months later, in March 2002, an orthopedist, Anver Tayob, M.D., assessed Plaintiff's physical residual functional capacity.  (Id. at 70-77.)  Dr. Tayob assessed Plaintiff's exertional limitations as of November 16, 2002 (one year after the alleged onset date) as being able to occasionally lift 50 pounds, frequently lift 25 pounds, and stand or sit for 6 hours during an 8-hour workday.  (Id. at 71.)  Plaintiff had no postural, manipulative, communicative, or environmental limitations.  (Id. at 72-74.)  He did, however, need corrective lenses.  (Id. at 73.)

In August 2002, Plaintiff was examined by Thomas F. Musich, M.D., at the request of his workers' compensation attorney.  (Id. at 231-33.)  Dr. Musich reported that Plaintiff complained of left knee pain at a level from one to nine out of ten.  (Id. at 232.)  He could not stand, walk for longer than 30 minutes, climb stairs, pivot, or walk on uneven surfaces without pain in that knee and occasional swelling.  (Id.)  He was unable to squat and had a 15% loss of flexion in his left knee because of the pain.  (Id.)  His gait was stable, but initially antalgic.  (Id.)  He had no history of, or complaints of, back pain.  (Id.)  Dr. Musich opined that Plaintiff had a permanent partial disability of 45% of his left lower extremity at the knee level.  (Id. at 233.)

## The ALJ's Decision

The ALJ concluded that Plaintiff had a severe combination of impairments – left knee and right ankle impairments, diabetes mellitus, and hypertension – that had more than a minimal effect on his ability to work but did not have an impairment or combination of impairments that precluded his return to his past relevant work as a fork lift operator as that job is defined in the Dictionary of Occupational Titles ("DOT"). (<u>Id.</u> at 12, 17.) In reaching this conclusion, the ALJ acknowledged that Plaintiff would not be able to work at all if his allegations were fully credible. (<u>Id.</u> at 14.) Further acknowledging that Plaintiff had a good work history, the ALJ found this consideration did not control the issue of credibility. (<u>Id.</u>) Rather, the credibility of Plaintiff was weakened by the lack of supporting objective medical evidence, the lack of continuing treatment, and the lack of any restrictions placed on Plaintiff by any physician. (<u>Id.</u> at 15-16.)

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520. See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite

limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added). Some medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867. "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an

ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.**  See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent.").  After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  See **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000) (same); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998) (same).

The burden at step four remains with the claimant.  See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824.  See also 20 C.F.R. § 404.1520(f).  If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a

whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently." **Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

## **Discussion**

Plaintiff argues that the ALJ's adverse decision is not supported by substantial evidence on the record as a whole. Specifically, the ALJ erred by (1) failing to make explicit findings about the demands of Plaintiff's past work and then compare those demands to his RFC and (2) failing to properly analysis Plaintiff's credibility. The Commissioner disagrees.

Residual Functional Capacity. The ALJ determined that Plaintiff had the RFC to return to his past relevant work as a fork lift operator not as he had actually performed it but as it was defined in the DOT.[8] As noted by Plaintiff, the DOT description of a fork lift operator includes the need to "move[] levers and press[] pedals to drive truck and control movement of lifting apparatus." (R. at 86.) Plaintiff contends that the ALJ fatally erred by not making explicit findings that he has the RFC to perform these tasks.

When determining whether there are jobs in the national economy that a claimant can perform, the ALJ is to take notice of the DOT. 20 C.F.R. § 404.1566(d)(1).

The ALJ found that Plaintiff could not perform the job of a fork lift operator as he previously performed it because it required heavier exertion than he then could do. He could, however, perform the job as it is defined in the DOT. The DOT definition included the ability to move levers and press pedals; however, the ALJ specifically found that Plaintiff could operate arm and leg controls. This finding was premised on the reports of the two physicians who operated on Plaintiff and who most consistently treated him that he could

_____

[8]The job of a fork lift operator is classified as requiring "medium" physical demands. (R. at 86.)

return to his former job without any restrictions. Additionally, Plaintiff testified that he could drive and did not qualify that testimony with any reports of difficulties operating the brake or gas pedals. The reports of consulting physicians or of Dr. Bockhorst to the contrary were based on his descriptions to them of his limitations. See **Craig v. Apfel**, 212 F.3d 433, 436 (8th Cir. 2000) (finding that ALJ properly disregarded portions of physician's report that were based on claimant's subjective descriptions of pain).

Because, for the reasons set forth below, the ALJ properly discounted the credibility of Plaintiff's descriptions of his limitations, the ALJ did not err in finding Plaintiff could return to his past relevant work as that work is defined in the DOT.

Plaintiff's Subjective Complaints. As noted above, when evaluating a claimant's RFC, the ALJ must consider, inter alia, the claimant's own descriptions of his limitations. **Pearsall**, 274 F.3d at 1217. Consequently, the ALJ must evaluate the claimant's credibility. **Id.** at 1218. "'Where adequately explained and supported, credibility findings are for the ALJ to make.'" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (quoting Lowe, 226 F.3d at 972). As noted by the Commissioner, however, "[t]he ALJ need not explicitly discuss each Polaski factor." **Strongson**, 361 F.3d at 1072. "It is sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints." **Id.** Accord **Lowe**, 226 F.3d at 972. In the instant case, after thoroughly summarizing the medical evidence, the ALJ considered Plaintiff's subjective complaints and discounted them based on several Polaski factors, including the lack of supporting objective evidence, the lack of an opinion by Plaintiff's treating or examining physicians that he was

disabled, and the lack of any restrictions that would preclude the relevant work activity. These are proper considerations.  See **Hutton v. Apfel**, 175 F.3d 651, 655 (8th Cir. 1999) (lack of physical restrictions placed on claimant by physician militated against finding of total disability); **Jones v. Callahan**, 122 F.3d 1148, 1152 (8th Cir. 1997) (subjective complaints of pain were properly discounted on grounds that, inter alia, they were inconsistent with absence of medically ordered commensurate restrictions on claimant's activities); **Shelton v. Chater**, 87 F.3d 992, 996 (8th Cir. 1996) (record supported statements concerning pain as a general matter but not to severity and degree of which claimant complained; recommendations of doctors were devoid of any restrictions and were of conservative treatment; and limited activities were result of lifestyle choices, not medically necessitated limitations); **Stephens v. Shalala**, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support pain is strong evidence of lack of a severe impairment); **Barrett v. Shalala**, 38 F.3d 1019, 1022 (8th Cir. 1994) (holding that the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints).  The ALJ also properly considered Plaintiff's failure to seek continuing medical treatment and the duration of his two most critical impairments as detracting from his credibility.  See **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005); **Raney v. Barnhart**, 396 F.3d 1007, 1011 (8th Cir. 2005); **Haggard v. Apfel**, 175 F.3d 591,  594 (8th Cir. 1999).  Moreover, the ALJ considered Plaintiff's good work history as adding to his credibility.  See **Id.**

The foregoing factors were considered by the ALJ after he outlined the factors relevant to an analysis of a claimant's subjective complaints. "Although the ALJ 'did not explicitly discuss each [relevant] factor in a methodical fashion, he acknowledged and considered those factors before discounting [Plaintiff's] subjective complaints of pain.'" **Forte v. Barnhart**, 377 F.3d 892, 895 (8th Cir. 2004) (quoting Brown v. Chater, 87 F.3d 869, 871 (8th Cir. 1996)) (first alteration in original; second added). The Eighth Circuit Court of Appeals has stated that "[a]n arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where . . . the deficiency probably had no practical effect on the outcome of the case." **Id.** (interim quotations omitted) (alterations in original). Accord **Strongson**, 361 F.3d at 1072.

In the instant case, the ALJ considered the relevant factors. Any deficiency in not clearly identifying those factors had no practical effect and is not, therefore, a sufficient reason to reverse the Commissioner's adverse decision.

## Conclusion

For the foregoing reasons, the Court finds that there is substantial evidence in the record as a whole, including a consideration of the evidence that detracts from the ALJ's decision, to support the ALJ's conclusion that Plaintiff is not disabled within the meaning of the Social Security Act. Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.  See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of August, 2005.